ALBERT F. RASP, APPELLEE, V. WILLIAM D. McHUGH, ELEC-
TION COMMISSIONER OF DOUGLAS COUNTY, ET AL.,
APPELLEES: CITY OF OMAHA, APPELLANT.

FILED JUNE 13, 1931. No. 27923.

· *John P. Breen, John F. Moriarty, Thomas J. O'Brien* and *B. J. Boyle,* for appellant.

*Kelso A. Morgan, Brogan, Ellick & Van Dusen, Henry J. Beal* and *Albert May, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

PAINE, J.

At a special election called to vote upon bonds, the proceeds of which were to be used to widen a street in the city of Omaha, the report of the official canvass was that the proposition was defeated by a vote of 26,136 for to 26,245 against, thus failing to carry by 109 votes.

Thereupon the plaintiff, a resident taxpayer, brought a contest in the district court against the city of Omaha, the election commissioner and the members of the canvassing board to secure a recount of the ballots.

The transcript shows no record of any appointment of a referee, but about 30 pages of the transcript set forth a report of Referee George W. Pratt, in which he states that he was appointed by the district judge upon December 29, 1930, to hear said matter; that he began a recount of the ballots on the same day and called them off person-

ally and they were tallied by Gerald E. LaViolette and C. E. Musgrove, which work consumed fourteen days; that thereafter three days were spent in taking evidence and the argument of counsel, after which the referee spent six days in the study of the briefs and in the preparation of his report.

The report discloses that the evidence was taken by a court reporter and many exhibits were introduced in evidence. But, unfortunately, no bill of exceptions or exhibits are brought to this court, which must content itself with the examination of only such facts as are to be found in the referee's report, which was adopted by the district judge over many objections of the appellant, the city of Omaha.

The results, according to the referee's report, showed that 26,049 had voted for the proposition and 26,028 voted no, making a majority, according to the referee, of 21 votes in favor of the proposition, approving awards of $318,026.36 for widening the street and authorizing the issuance of bonds of the city in the aggregate sum of $217,887.13 to pay the excess cost of said improvement.

The district judge approved and ratified the report of the referee upon the facts as well as upon the law and allowed him the sum of $600 for his services, taxed all costs against the city of Omaha and directed the city to at once proceed with the project.

1. In the referee's report it is set out that A. I. Creigh, one of the judges of election in the seventh precinct of the third ward, indorsed 99 ballots with his initials only; and in the seventh precinct of the eighth ward a judge, Alva M. Gregg, signed only his last name on 83 ballots; and in the twentieth precinct of the tenth ward Edwin Hogle, one of the judges, signed only his last name upon 236 ballots.

The provision which relates thereto reads as follows: "When any duly qualified elector shall present himself at the polling place of his election district or precinct, for the

purpose of voting at any election then in progress, he shall receive from the judge of the election board a ballot, on the back of which two judges of the election board shall first write their names in ink." Comp. St. 1929, sec. 32-704. See *State v. Russell*, 34 Neb. 116.

In *Orr v. Bailey*, 59 Neb. 128, it was held that, as the Australian ballot law requires that the names of two judges shall be written on the back of each ballot, a ballot not so indorsed shall be void and not counted, thus deciding that it is mandatory. Chief Justice Harrison also wrote the long opinion in *Mauck v. Brown*, 59 Neb. 382, which was handed down at the same term of court. This Nuckolls county case disclosed a remarkably close race for the office of county attorney, and while it appeared on the face of the returns that H. H. Mauck had won by four votes, yet nine ballots were discovered with only the name of one judge indorsed on the back. These ballots being thrown out, an election was changed because of the negligence and carelessness of one of the judges of election in that precinct in failing to indorse such ballots.

In *Crosby v. Haverly*, 82 Neb. 565, this court declared that ballots not indorsed at all by any election official are absolutely void. Therefore, this court has held that ballots with no indorsements were void and ballots with the indorsement of but one judge were void, yet it has liberalized this rule somewhat.

In *Griffith v. Bonawitz*, 73 Neb. 622, ballots were signed by one judge and with the initials of another judge, as in the present case. The court decided that, the purpose of the indorsement being to identify and establish the authenticity of the ballots, the spirit and purpose of the statute were entirely complied with by the signature of the one judge by his initials.

A ballot which has been carelessly signed by a judge of an election precinct with his initials only, or with his last name only, and not as the law requires, need not be rejected in the canvass of votes.

2. The referee finds that in the seventh precinct of the fourth ward 22 "yes" ballots, 14 "no" ballots and 9 blank ballots were signed by but one of the judges of election, and that an inspector stationed at that polling place by the name of William Haffke had taken said ballots and signed the word "Haffke" on the back of said 45 ballots; and that in the second precinct of the fifth ward the inspector, Arthur Espergan, stationed at said polling place, had taken ballots signed by but one judge and signed his name in the place of a second judge upon 25 "yes" ballots and 20 "no" ballots and 4 blank ballots, a total of 49 ballots.

Upon these facts the referee makes his finding that this complies fully with the statute, and the associate counsel for the appellee argue that the objections made to these inspectors assuming to act in the place of judges of election are completely disposed of by the case of *Bingham v. Broadwell,* 73 Neb. 605. This was another Douglas county case, and Commissioner Ames found that in the first precinct of the fifth ward of South Omaha some of the ballots were signed by one judge and also one clerk. He held that these ballots were valid by the expedient of treating the signature of an election clerk as being that of a *de facto* election judge. In justifying and explaining this conclusion, the court quoted the provision of our Constitution protecting the elective franchise, and declared that statutes limiting the right and opportunity of the elector to register his will must be liberally construed in his favor.

Many states have held to a more strict rule than has Nebraska, and we may cite the case of *Kirkpatrick v. Deegans,* 53 W. Va. 275, in which the provision of the statute is discussed which requires two poll clerks "to write his name" on the back of the ballot before it is given to the voter, and the court held: "Hence the words, 'shall write his name,' mean that the name of each poll clerk shall be placed on the back of each ballot voted, in his own hand-

writing, and ballots on which the names of both poll clerks are written by one of them, or by some other person, are void and cannot be counted."

The same court, in a later holding on the same point, says that if ballots have not been personally signed by both poll clerks they should not be counted. *State v. Farley,* 97 W. Va. 695; *State v. Heatherly,* 96 W. Va. 685.

Our attention is called to the case of *Weber v. O'Connell,* 55 N. Dak. 867, in which the North Dakota court, in construing a statute which provided in the canvass of the votes any ballot which is not indorsed as provided in this chapter by the official stamp and initials shall be void and shall not be counted, held that absent voters' ballots not indorsed by official stamp and initials pursuant to statute cannot be counted.

In addition to the section of our statute, heretofore quoted, which requires two judges to sign their names in ink on the back of the ballot, we find section 32-707, Comp. St. 1929, which reads in part as follows: "The voter shall fold his ballot so as to conceal the names and marks thereon and to expose the names of the judges of the election board upon the back thereof, and shall without delay, and without exposing the names or marks upon the front thereof, and without leaving the inclosure in which the compartments are placed, deliver the ballot so folded to the judge of election, who shall, without exposing the names or marks on the front or face thereof, approve the signatures upon the back thereof, and deposit the ballot in the ballot box in the presence of the elector."

The voter in the case at bar, having so folded his ballot as to expose the two signatures on the back thereof, had probably no personal knowledge that they were not the signatures required by law, and the judge who accepted his ballot had the duty under his oath of approving such signatures on the back as the signatures of two judges, which he did by depositing it for the voter in the ballot box.

This court has accepted ballots signed by clerks who assumed to perform the duties required by law to be performed by a judge, and very reluctantly in this case we broaden this holding to include an "inspector" appointed under the election laws in force in the metropolitan city of Omaha, but those in charge of selecting judges of election boards should caution them to so perform the duties of their office that the signing, examining and approving of the names indorsed on the back of each ballot will be in truth what the law requires, i. e., the names of two judges of that election precinct, and of no other person. If judges fail in this regard they should be replaced by those who will act in accordance with our election laws.

A voter who has accepted a ballot with two names indorsed on the back thereof, each of whom he believes to be a judge, will not be deprived of his vote because one of the names was signed by an "inspector" appointed to that polling place under the election laws provided for Nebraska counties of over 150,000 population.

3. We will next consider the absent voters law. During the Civil War many states, both north and south, passed laws permitting the soldiers who were in the armies to vote in both national and state elections, and such laws have been held to be constitutional, even where they allowed the ballot boxes to be opened anywhere within or without the state and when they were in charge of only the commanding officer, who might not be a voter in that state at all nor subject to the jurisdiction of that state, and these laws permitted soldiers to vote where there was no evidence at hand of their qualifications to vote had they been at home. These early laws permitting absentee voting were confined strictly to soldiers in the army, and such laws were approved by the federal house of representatives, which held such statutes constitutional so far as they affected the election of members to that body.

In some states soldier voting acts were held to be unconstitutional as applied to state officers—*Bourland v. Hil-*

*dreth* (1864) 26 Cal. 161, which interpreted an article of the California Constitution as requiring the actual presence of the voter on election day in the county of his residence.

During the time of the Spanish-American war similar acts were passed to allow those electors of various states who were in military service to vote and in 1916 and 1917, during the World War, additional laws were passed with the same end in view.

Absent voting by soldiers having been found satisfactory, several states adopted laws to permit voting by others whose peacetime occupations required their absence from their residence on election day.

In the case of *Straughan v. Meyers* (1916) 268 Mo. 580, the court upheld a law passed in Missouri to enable railroad employees, traveling salesmen, and other persons whose duties or occupations required them to be absent from their voting precincts on election day, to cast their vote wherever they might be within the state, and we find the following language used in the opinion: "In the first place, it was enacted to provide the means and machinery through which a certain class of citizens might enjoy a privilege which, under the general laws, could not be exercised."

4. Occupational absentees being thus accorded this privilege, many states began to enact laws allowing sick and disabled voters to share in the right of suffrage by voting by mail.

The Nebraska law governing such voting is found in sections 32-801 to 32-816, Comp. St. 1929. Such voter, if he has resided in a precinct where registration is required, must furnish to the county clerk a certificate of the registration officer to the effect that he is duly registered in that precinct, and upon receipt of the application from the absent voter, with the certificate of registration, the clerk issues an absent voter's ballot to him with an identification envelope, a return envelope, and an instruction card, as hereinafter described. Section 32-804 then directs: "The

clerk shall at once enter said voter's name, post-office address, residence and voting precinct, with party affiliation if the election be a primary one, in a poll book to be kept by such clerk for such purpose, which poll book shall be open to the public; and shall notify the election board of applicant's precinct of such application."

The referee finds that the commissioner did not keep the poll book for mail voters, as prescribed by statute, which poll book the law requires must be kept open to public inspection, but suggests that he simply retained the original applications sent in for such mail votes.

Upon receipt of an application from an absent voter for a mail ballot, the clerk, or election commissioner in counties of over 150,000 population, is required to enter all facts relating thereto in a poll book which shall be open to the public. This plain requirement of the statute is not met simply by keeping the original applications on file.

5. Section 32-812 further directs that before issuing the ballot to such applying voter "the clerk shall identify the same by indorsing his name and official title on the back of the ballot."

The law provides that upon receipt of such absent voter's ballot he must exhibit the same to a notary public, a commissioned officer of the army, or such other official as may be allowed to administer oaths, and must exhibit the unmarked ballot to such official and then in his presence mark the ballot, and, as provided in section 32-805, must then "fold the same so that the indorsed name and title of the clerk is exposed and all other marks hidden and deliver the same to the official who shall place the same in the identification envelope and seal the same." The voter then subscribes to the oath printed on the identification envelope, giving many facts about his age, occupation, residence, etc., and the official then places the same in the identification envelope and seals the envelope under his official seal. Section 32-808 provides: "Upon receipt of such return envelope the clerk shall keep same unopened

until the canvassing board called by the clerk meets as provided by law. Such canvassing board shall constitute an election board * * * and shall receive, count and return said votes in like manner as near as may be as other election boards receive, count and return the ballots of present voters. * * * At least forty-eight hours prior to the sitting of said board of canvassers as an absent and disabled voters' election board, the clerk shall post in a conspicuous place in his office a notice stating the day and hour when such canvassing board will sit as such election board."

Section 32-810 provides: "After the canvassing board meets but before proceeding to the canvass, it shall sit as an absent and disabled voters' election board as above provided, and as such election board shall publicly open such return envelopes as have been by the clerk received and allow public inspection of the identification envelopes but without the same leaving the custody of the board, and shall compare the identification envelopes with the absent and disabled voters' poll list * * * (32-804), and if the names appearing thereon agree and if the signature of the voter on the identification envelope agrees with that on the application retained by the clerk * * * and if the ballot have the clerk's indorsement thereon the same shall be placed unopened in a ballot box to be provided and known as the absent and disabled voters' ballot box.". It is also provided in section 32-811: "If it do not appear to said absent voters' election board that an absent or disabled voter's ballot has been issued to the voter whose name appears on the identification envelope, or if the signature on such envelope is not that of the voter on the corresponding application, * * * the board shall reject the vote, and in such case shall not open the identification envelope, or if the rejection be after the opening thereof and because of the absence of the clerk's indorsement of the ballot, shall forthwith return said ballot to such envelope and seal the same up and such rejected ballots, with all envelopes and other papers, shall be held in like manner

and for same time as other ballots and papers pertaining to such election."

The last section of the law relating to absent or sick electors provides in section 32-816: "The county clerk of the county in which said absent or disabled voter resides shall receive said ballot and shall safely keep and preserve the same unopened in his office until the board of county canvassers canvass the vote according to law, at which time the said board of canvassers, in the presence of the said county clerk, and no other person, shall open said envelope and record the said ballot upon a special poll book showing the proper precincts or wards of each voter and in the same manner as clerks of election record votes; and in so canvassing said vote, the board of county canvassers shall count the votes of all absent or disabled voters taken as herein provided and add the same to the total abstract of voters the same as if a separate precinct."

An election commissioner is appointed by the governor in Douglas county for the term of two years under the provision of the law relating to registration and elections in counties of over 150,000 population. Comp. St. 1929, sec. 32-1801. This election commissioner is required to perform all the duties in reference to elections of a county clerk in the other counties of the state. Section 32-1805, Comp. St. 1929, provides that said commissioner is responsible for the enforcement of the election laws.

We have set out in some detail the simple but effective requirements to grant this new right to cast a ballot to an absent or disabled voter.

The entire argument, as well as brief, of special counsel for the city of Omaha, John P. Breen, was directed to the violations of the many sections of the election laws in the issuance, acceptance and counting of these absent voters' ballots, which numbered 260 "yes" and 208 "no" mail votes.

Let us examine carefully the facts as set out in the report of the referee. He finds that the election commissioner did not personally sign his name and his official designa-

tion or title on the back of a single one of said ballots for the purpose of identifying said ballots, as required by law, nor was his signature and title placed thereon by any one else for him, but that said election commissioner appointed a Mrs. Thomas to have charge of such absent and disabled voters' ballots, and while there is no record of her being sworn in, her name is on the pay-roll in his office. The commissioner, when first called to the witness-stand, testified under oath that Mrs. Thomas had selected two other ladies to assist her in this work, but several days later permission was given to withdraw the rest and to change this testimony, and the election commissioner then testified, touching this matter, that Mrs. Thomas had suggested to him the names of two other ladies to assist her, and that he had appointed them, and that the names of such ladies were Mrs. Neilsen and Mrs. Shumaker, and that only one of these three ladies signed simply her last name, to wit, "Mrs. Thomas," "Mrs. Neilsen," or "Mrs. Shumaker," on the back of all the ballots which were mailed out to absent voters in this election, with no other mark or designation except such last name.

It is strenuously argued by the counsel for the appellant, the city of Omaha, that the right of those voters who cannot be present in person to vote is a purely statutory right or privilege, and that all statutory provisions relating to this privilege extended to such voters to cast a vote by mail are to be strictly followed and are mandatory provisions.

It is further insisted in the brief that section 32-812, Comp. St. 1929, when applied to Douglas county, would require that before issuing ballots to such mail voter the election commissioner shall identify the same by indorsing his name and official title on the back of the ballot, and it may be assumed that the legislature had the power to choose and fix the exact form of indorsement that must appear on the back of these mail ballots; and can it be said that the election commissioner, by choosing not to

sign his name 468 times with his title thereunder, but directing some woman in his office, as "Miss Jones," for instance, as appellant suggests in his brief, to write her name on the ballot, complies with the requirements of the law? It is admitted that her name might identify the ballot, but the legislature in its power and wisdom has determined just what name and title must appear on the back of the ballot for identification purposes, and it is admitted that this provision was not followed.

If in *Orr v. Bailey*, 59 Neb. 128, this court decided that ballots would be rejected where the voter was present and placed a ballot in an election box himself, which had on the back of it the name of one judge instead of two, as the law required, can it be argued that a "Miss Jones" indorsement, for instance, on the back of a mail vote would allow such ballot of an absent voter to be legally cast or counted?

A set of instructions is provided and sent out with these mail votes to the voter who desires this especial privilege, and as this can be sent to him several weeks before election, by examining the instructions he can ascertain for himself that the ballot sent him does not bear the indorsement of the election commissioner nor his title on the back, as by law required, and can call attention to this defect and secure a new ballot in time to vote.

In Indiana the statute requires that each absent voter's ballot shall bear the signature of the clerk of the court and the impression on the ballot of the seal of the court. In discussing a case in which five ballots did not bear the impression of such official seal before being sent to absent voters, the court observes: It is the duty of the voter on receipt of the ballot to examine it to see if it is official, in the sense that it has everything done to it which is prescribed by law. If it lacked in some one or more of the things which are required to make it an official ballot, the voter should have returned it and asked for a properly prepared official ballot. "Inasmuch as it has been held that

a ballot is invalid and void and cannot be counted when voted personally within the election room if it lacks the initials of either one or both of the poll clerks on the back thereof, it follows that the identification of the absent voters' ballots in question was incomplete and such ballots ought not to have been voted by the persons who voted them, and, for want of proper identification, are illegal and void and ought not to be counted." *Werber v. Hughes*, 196 Ind. 542.

The Illinois court held that the requirement that one of the judges shall indorse his initials on the back of a ballot before giving the same to the voter is not satisfied by the use of a rubber stamp bearing the initials of one of the judges. *Choisser v. York*, 211 Ill. 56.

The law, as set out in section 32-811, Comp. St. 1929, requires that after the identification envelope is opened the ballot shall be returned to such envelope and sealed up with the rejected ballots if the indorsement of the name of the election commissioner and his title do not appear thereon, so that such ballot must not be allowed to be placed in the ballot box provided for mail votes if it is not indorsed as the law plainly directs.

As stated in *Orr v. Bailey, supra:* "The elector is charged with a knowledge of the law, and he can hardly escape the discovery that the signatures are or are not on the back of the ballot when he folds it and that it is or is not a ballot which can be used." Such absent voter, upon examining his ballot, and especially upon folding it up in the presence of the notary public, can see at once that it does not have the name and title of the election commissioner indorsed thereon, and so knowing and discovering at the time of folding his ballot, he must know that the ballot which he holds is not one which is authorized as an official ballot, and that he has no right to vote it.

It is contended by the appellee that the election commissioner possesses ample power to appoint deputies and also many assistants, and that he is not required to do the

work himself, and if this is admitted, yet it is the well-settled law of the land that such work done by deputies must be done and performed in the name and title of the official required by law to perform the duty, and that this rule is not met by the signature of a clerical employee not a deputy.

A ballot, before being sent to a mail voter, is required under section 32-812, Comp. St. 1929, to be identified by the clerk (or election commissioner in counties having 150,000 population) indorsing his name and title on the back thereof. A voter receiving a ballot indorsed simply "Mrs. Thomas" should at once return the same, as it is not a legal indorsement and such ballot cannot be counted.

6. The referee further finds that said ballots were not counted in the manner required by law by the canvassing board of Douglas county, which the pleadings show consisted of F. W. Pruitt, Samuel Greenberg, and William D. McHugh, the election commissioner.

The referee's report discloses that the oral evidence proved that the canvassing board of Douglas county did not sit as an election board for the purpose of counting the mail votes, but that after the application and envelope had been examined and the mail votes placed in a ballot box such box was turned over to an unnamed and unidentified group of office employees to count; that all the canvassing board did was to accept the totals from the other group, and that the canvassing board did not sit as an election board, as required by law, and did not count or canvass any of such mail votes.

Granting that the signature of the election commissioner and his title could have been indorsed upon the ballot by one of his deputies, yet such a defense cannot be interposed as the reason for turning over the ballot box holding the mail votes to unnamed employees and clerks in the office to canvass, for the law, as hereinbefore set out, specifically directs that this counting shall be done only by the board of county canvassers in the presence of the election commissioner and no other person.

This provision of the law is a very wise enactment of our legislature to guarantee that mail votes shall be personally canvassed only by persons who have been duly appointed to this responsible position, and that no other person shall be in the room to interfere while they canvass these votes.

This court is charged with the duty of construing the law as passed by our legislature, and in the absence of any showing that the plain mandates and requirements of the law were followed we are compelled to hold that the district court erred in overruling the motion for a new trial, in that the evidence clearly shows that no one of the mail votes was issued with the signature of the election commissioner and his title, as required by law, and for the reason that the mail votes were not canvassed as required by law, and therefore the mail votes, of 260 "yes" votes and 208 "no" votes, must be rejected; and as the referee found a majority of 21 votes in favor of the proposition, this leaves a majority of 31 votes opposed to the proposition, and the court therefore finds that it failed to carry at the special election held November 4, 1930. If another special election is thought desirable, all of these errors can be avoided by the officials in handling the ballots. Costs taxed to appellee. Reversed in accordance herewith.

REVERSED.